But don't go far, Mr. Woodbury, because the next case for argument is Native Ecosystems v. the Forest Service. Get rid of me that easy. All right. Before you proceed with your argument in this case, just so we can be clear, we have a motion. This is the Elkhorn Project, and you would suggest that we treat the observation chart as demonstrative evidence that summarizes other than the last column, which is new evidence after any supplemental information report. And is there any other item to be supplemented here? Do you want to put the 5-year report? Your motion is still pending with respect to the 5-year report and this case. Is that correct? That's correct. Thank you. You may proceed. The 5-year report is in the record for this case, but it was just redacted. And the portions that were redacted are those portions that undermine the assumptions that the project rests on. Could you explain that? There's a redacted version of the 5-year report? They included the 5-year report cover and a few pages from the 5-year report that supported some aspect of their decision and then excluded the balance of it. But so obviously it was before the decision maker. So a select part of it was in the record. Yes. A part of it was submitted in the record of this proceeding. Right. But not all of it. Okay. That's correct. And did your motion to supplement in this case was made for the first time in the court of appeals, is that correct, not in the district court? That's correct. That document had never been released to the public. And in fact, Native Ecosystems Council had never seen the portions that were not in the record. And it was only in preparing a subsequent litigation on the Helena National Forest that it came to my attention. At that point, we were already in the circuit court. Maybe I misread something, but I thought that that document was out in 1999. It was in response to a 1999 Freedom of Information Act request by the Ecology Center on a timber sale that is subsequent to these that they're going forward or proposing to go forward now called Clancy Union Bill, which is subject of new litigation. So it was in a box, basically, of information that was responsive to that Freedom of Information Act request. And if the Ecology Center, obviously, the Ecology Center had constructive notice of it for that reason, but they didn't know when I when I brought it to their attention, they didn't understand what fiber report, what the significance of it was legally or that it had never been released to the public. And then when I discuss it with the other appellant, Native Ecosystems Council, she had never seen it before. She said, I remember it being referenced in the record. Speak out, sorry, speak up. OK, I'm sorry when the government put part of that part of that report is in the record of decision. Is that what you're saying? That's correct. So that's the agency's own files of what they relied on. And there's no opportunity at that point for someone before the agency to ask them to add the rest of the report. Is that right? That would have been appropriate if if if, for instance, Native Ecosystems Council had some way of knowing that the portions not included were relevant to the issues in this case. But they had never seen the other portions of that report. And so they just just thought it was another part of the 10,000 page administrative record for the district court. Why wasn't this file before the district court? Well, again, it didn't come to our attention until we were already on appeal in this case, both of these cases. It's obviously before the district court now. Well, how is it before the district court now, not in this case? No new litigation. OK, we're getting into some of the issues on this case. Explain why is it that in challenging this particular project, this particular activity, Native Ecosystems gains a right to challenge the lack of a forest wide monitoring of the goshawk? Well, because the project would have adverse impacts on the on the northern goshawk and the northern goshawk is the management indicator species for old growth habitat and. And. Remember, you know, using my cases. And. Yeah, so essentially. The. Whenever a project has an adverse impact on a management indicator species, then there's a requirement to demonstrate that it won't adversely affect that species viability. So in order in order for the forest service to make that showing, they have to explain, first of all, that the species is viable in the forest. They haven't they haven't even done that in this case or any other case in the Helena National Forest. So let me let me just understand again, make sure I'm not mixing them up. The Elkhorn project does not include old growth forest. Is that correct? I'm sorry, Your Honor. It does not include old growth forest. My understanding was that this particular project, you don't have old growth forest within it. My understanding was the same as Judge McEwen's, that you had mature trees, but not old growth. You had something prior to old growth. They might get there, but they're not. I think what the record shows was that it would develop into old growth. It was close that it would it was within 20 or 50 years of developing into old growth and it would develop into old growth. All right. So the answer is that the project as evaluated doesn't include old growth, correct? I believe that it doesn't. It does not treat old growth habitat. It treats potential old growth. So now, if you build on Judge Gould's earlier question, if we have an area that is not old growth, but is a wildlife management area, why do you need how does the forest wide monitoring figure in to the evaluation of the wildlife management on this unit? Um, well, first of all, in in the there's a difference between complying with the old growth standard and ensuring the viability of an old growth species. So in this case, we're not raising the issue that they're not in compliance with their old growth standard. Rather, we're saying they're not ensuring the viability of the old growth species. The northern goshawk in this court made that distinction very clear in the lands council versus Powell, which also didn't involve the logging of any old growth trees that clearly impacted old growth species. And the other the other response to that, the other answer to that question is that this wildlife, the special use area was intended to benefit wildlife that depended on basically dense forest forests that that had a high, high density. And that also includes the goshawk in addition to elk and so forth. OK, so these goshawk that live there, are you saying that this proxy on proxy approach? I mean, I think that's what I'm reading from your brief, that that's invalid here. Yeah. So, I mean, there's different ways of showing that the goshawk is viable. And in the Helena National Forest, they don't have population trend data. They don't have enough data to estimate the populations of the goshawk forest wide or what the trend is. And they they admitted that in the answer to the to the complaint in this case. So then in order to show that it's viable and that this project is not going to create a trend towards non-viability, I guess, then they have to fall back on their proxy and say, well, you know, for a slide, everything's fine because we have, you know, this amount of habitat and that's all the goshawk needs. So even if this does have adverse impacts, it's still viable. Well, again, the proxy in the Helena plan was 5 percent old growth habitat. It was to be an indicator species like the goshawk were to be monitored to measure the effect of management activities on representative wildlife habitats in order to ensure viability. And they didn't they don't have. Also, this is a wildlife management unit. Yes. And it's the only one, I guess, in the national forest system. So what additional obligations are imposed on the Forest Service in light of that designation? Well, they're they're only allowed to log in this area if they can demonstrate that they're improving wildlife habitat. So it's kind of similar to the enhancement thing. And now they're saying that a project that was previously struck down because it didn't benefit wildlife and that they were not in compliance with their plan. They came back and did an EIS and said, well, it does the same project does benefit wildlife. Unfortunately, it doesn't benefit any of the management indicator species associated with that area. And it doesn't it doesn't it doesn't benefit the elk, which this is like the most heavily. This is most popular hunting area in Montana for elk, the elk horns. And that's already very accessible. And the project would basically eliminate a three mile long, half mile wide swath of hiding cover and low land, low land, low lying area. But also you challenge the Forest Service analysis of the summer hiding cover. Is that right? The percentage of hiding cover? Hiding cover, yes. And is this the issue where the district court said that what was done with the denominator was changed was suspicious or questionable, but the district court felt it had to defer to the agency. That's correct. So explain, if you would, please, what I was the guess if you reduce the size of the denominator, the percentage goes up. Right. So what what was done with the area, the denominator, the total total area? Well, they basically they basically analyzed they reduced it by by eliminating those areas and occurred in the elk unit, the Sheep Creek unit, I believe it's called that, that they hadn't observed Elkin, I suppose. So basically areas that probably didn't have any foraging or or or hiding cover. So it's not it doesn't seem to be consistent with the forest plan, which says either, you know, analyze on the basis of the entire unit heard or on the basis of a third order drainage. The forest plan said on the basis of the herd or the drainage, third order drainage. And what did they use here? Some. It's not entirely clear to me, but they did some radio telemetry and followed, you know, the species around, I guess, and then sort of redrew the sort of gerrymandered the larger area. They said, well, these are the only areas that they actually use. That's basically what they did. But they did that for the first time in this case. And we, you know, demonstrated how consistently in the forest plan, the travel management plan and the original forest plan. The analysis was always on the basis of the larger migration patterns of their of their herd. And it doesn't you know, it's hard to really obviously for the courts to second guess the Forest Service methodology. But so you can kind of fall back on on two things. You know, they historically recognize this area is low in deficient in hiding cover. And so now all of a sudden their new new analysis says, oh, it's no longer deficient in hiding cover. And so now we can have more roads and build a trail right through this hunting unit. So that's one thing. But the other thing is how you benefit elk by eliminating a three mile wide swath of hiding cover in an area that's most heavily hunted in all of Montana. Obviously, those elk are going to be in trouble when hunting season opens. So they said, well, there's more foraging habitat. You know, we've created more foraging habitat and the forest. You know, there are guidelines incorporated in the forest plan said, if you're going to do that, you better make sure there's enough hiding cover nearby. So that you're not basically creating a sink where all the elk are going to get fat forage and shot. Exactly. You would think that this was designed by hunters instead of the Forest Service. So, you know, we're basically you know, we certainly share the lower court suspicions. And we also think it's arbitrary and capricious because it's it's a classic definition of the record. Show a rationale by the Forest Service for the broader area that they used less than the drainage and less than the total birds range. But the record show what they did. I think I believe it does. I believe that they did the radio telemetry study and included that in the record. And radio telemetry, they put some radio collars on some elk and monitored the movement over the course of a couple of years, I guess, and said, these these are the areas that it moves in. So we're going to eliminate everything else from our analysis. So your your basis for saying it's arbitrary and capricious would be that they hadn't used it before. They'd always used the other. They haven't explored your area. They haven't reconciled really. You know, how is it that this area previously was, you know, has always been deficient in hiding cover. And now we can benefit the species by going in and eliminating a three mile swath of hiding cover in the lowland area. That's easily accessible by hunters. So it's kind of like, you know, they they did come up with a way of justifying the project, but it's not really a hard look because it doesn't really reconcile that with all the previous statements they've been making to the public consistently over the life of the forest plan. So it does sort of give the appearance that they're just trying to sort of juggle the books a little bit to justify logging in an area that's supposed to be for the benefit of wildlife. Let me go back to the goshawk for a minute. Is there precedent in the Cuddy Mountain case to the effect that even if the activity area project was not harmful to the goshawk, that the challenge to that project can invoke a review of whether there's forest wide monitoring of the species to ensure its survival? The project would adversely impact the goshawk. I don't think there's any dispute about that. Well, let's assume that this little project didn't hurt the goshawk right where it was. Oh, but could could the overall lack of monitoring still be challenged in this case? I believe it could on the basis that they're eliminating approximately one and a half potential post fledgling family areas of the goshawk. Basically, that's what that's how they analyze the cumulative effects. So basically about a mile and a half square of potential nesting habitat in an area that is adjacent to active goshawk nests. And so and it's a wildlife area. And and so the issue then becomes if we could show as as we believe we have through forest service data, that there is a problem with inadequate levels of habitat in the forest. And here you have an area that could provide that should provide good habitat. But for some reason is not currently that it looks like a very logical candidate for an area to be colonized by by the adjoining goshawks. And you have this is an area of the forest that actually has the majority, I think, three of the six active nests in the forest. So you have some activity in the area. And if they were not to thin the project, they were not to go forward with the project. It would certainly seem like eventually those goshawks would colonize this area. So the fact that it does affect that it is good habitat and the fact that it's not occupied would only be would only sort of get them off the hook. If if the areas if there were enough goshawks in the forest, in other words, you want to retain the remainder of your time for rebuttal. I think I'll I'll just wave rebuttal and just make one last point. Frank, and that is that the area, the management indicator species most closely associated with the type of mature forest that they're logging in this case is the American Martin. And so what I want to point out is that they call this ecosystem management. And the EIS makes it clear that if they did not go forward with their idea of ecosystem management, the Martin would find good habitat that the area would develop into good Martin habitat. There's no Martins in there right now. And if they go forward with the project, they say that it will not provide good habitat. And they also say the Martin is a good indicator of ecosystem health. So that seems to imply that the idea that the brand of ecosystem management that they're employing here is not consistent with ecosystem health by their own indications in the forest plan. And therefore, it's not going to benefit wildlife. Thank you. Mr. Woodbury, before you leave the podium, you're not a stranger to this court. We see you many times and we consistently criticize you for the quality of your briefs. And I think that it's been mentioned in the opinions and you really haven't taken it to heart. And the cases which we've had here today had some very substantial problems with the briefing. And my suggestion to you is that you may even be foreclosed from appearing in this court in future if you don't follow our rules, if you don't cite to the record appropriately. You seem to have a very substantial knowledge of environmental concerns and problems. And advocacy from persons like yourself is important to this court, but it needs to be conducted in a very professional way. And if you're not able to do it yourself, you need to associate some really expert in appellate advocacy. I'm just giving you this this morning and I think that you must take it to heart this time. May I briefly respond to that, Your Honor? Well, I don't know what kind of a response there can be to that. But go ahead. I'm the only attorney in all of Montana that's doing this kind of case. And I admit that the amount of my caseload and the demand for my services affects the quality of my briefing. And I regret that. And it's just I have a hard time balancing the demands on my time with your client. But I learned a very hard lesson in this case. I don't think you understand the burden that it imposes on the judges and their clerks and really the inadequacy of some of the arguments which you present. Thank you very much. I'm not going to suggest how to run your practice, but much of what we're talking about is linking arguments to evidence, which doesn't necessarily always require a lawyer to undertake that, your clients, legal assistant. But if we don't have a tie in the record to the argument in the brief, then what might be a very good argument really goes to waste. We can't really consider your argument in an administrative case without the record. And it's probably because of the standard on appeal, it's more important in administrative law cases perhaps even more than others. We don't have plain error and things like that here like we might have in a criminal law case. So I only suggest that some of this linking of the record and the arguments, although I understand your resource limitations, might be done by others as well. Thank you. We'll proceed with the government. May it please the Court. Michael Gray on behalf of the federal appellees. If I may, I'd like to start with the elk summer range standard. There's been an allegation here that the Forest Service has somehow cooked the books on this. Well, I don't know if they've cooked the books, but what I'm concerned about is whether they have shown a rational and non-arbitrary basis for how they calculated the denominator that went into assessing coverage. I understand. I'm not suggesting they're cooking the books, but I'm questioning whether they've been arbitrary and capricious in their methodology. I understand. Counsel, if you don't mind, before you get to that issue, I would like you to address what it means by having a wildlife management unit and what additional obligations that it imposes on you. My understanding is that you're trying to move to a broader type of use for the area, allow timber harvest because of the benefit to the human beings for their jobs or their needs and for grazing and other things, where perhaps a wildlife management unit means some different responsibilities. No, I think that's right. I think it does impose additional responsibilities, and there are two that are particularly relevant here. The first is that we're supposed to manage the area to optimize big game habitat, elk, mule deer, that sort of thing. What this project is designed to do is to increase the forage base for those big game, because now they're not using this particular area. Because of the conifer growth in the area, you get this pine needle duck that suppresses the growth of the shrubs and the things that the elk would eat, so they're not using the area as much as they ought to be. So what the project will do is thin out those areas, not because of the benefits to the surrounding community, although that's part of it, but because of the benefits to the elk, because the elk will now be able to have that forage base. The other particular standard that applies in this management unit is that we're supposed to use prescribed fire and timber manipulation to promote aspen and willow growth. There are lots of aspen stands in this area that right now are degenerating and dying. What this project is designed to do is to thin out, again, the conifer growth, which shades out the aspen and which increases the acidity of the land, so that those aspens will have a chance to regenerate. So we thin it out, we burn through in a prescribed fire way, that promotes the aspen growth, and then in a couple of stands, we're actually going to fence off the aspen stands to help promote the growth, so that when the elk come in, they're not going to eat the aspen and destroy them. So there are two very particular things that apply here, and those are what the project is designed to implement. As to the elk standard, the old analysis that drew the 46,000 per unit, that's the entire unit. Those analysis were conducted for the open road hiding cover matrix. There are two hiding cover standards in the forest plan. There's the summer range standard, and then there's the open road density hiding cover matrix standard. The open road density standard, the forest plan is very clear that you adjust your analysis area to the area of what you're studying. So you can use it on a large geographic area, like timber sale analysis, or for the entire forest, or for the entire herd unit. Now, those old documents were for the forest wide EIS, and for the travel plan amendments, which were forest wide. So they studied it on the entire herd unit basis. The EIS here was for the timber sale analysis area, which is the forest lands around the project area. Let me, here's one of the confusions, because in this case, Native Ecosystems did cite to the record, and if you look at the forest plan itself, it says on record 97, it says the environmental analysis for project work will include a cover analysis. The cover analysis should be done on a drainage or elk herd unit basis. Then you go to the next page, and it says, the existing hiding cover to open road density ratio should be determined over a large geographic area, such as timber sale, a third order drainage, or elk herd unit. So maybe you can explain how do you read those two statements. The first, first of all, it says it should be, and the Forest Service can interpret their plans, and so it's not a mandatory requirement that it should be done on that full basis. And so when the Forest Service here was studying the hiding cover versus open road density, because that was the particular issue that had been raised in comments, it looked to the second and said the analysis area ought to be the timber sale analysis area. So I think that's how you reconcile those two provisions. Okay, so just so I get straight, it says the existing hiding cover to open road density ratio, is that the ratio that's being studied here for the so-called hiding cover? That's correct. The FEIS studies that ratio, and so that's the analysis area. Now, like I said, there are two things that hiding cover can be used for. The second is the summer range standard, and that's what Native Ecosystems complains about. So in order to get to the summer range standard, which is 35% across the summer range, we admit there is no, in the EIS, there's no direct statement about that summer range, because frankly, it hadn't been an issue at that point. And so the area, though, of summer range... In the EIS, there's no explanation of how you calculated your summer range? That's correct, Your Honor. But the hiding cover analysis applies the same way. It's the same information. All of the information from which you would make the calculations to determine the percentage on summer range are in the administrative record. We know the area that they studied. We know how much hiding cover was on that area. And we know the general parameters of the summer range. And so the question is, can the court determine from the record that that standard has been complied with? And our answer is, yes, if you look at the maps that we provided in our supplemental excerpts of record, that you can, the court can, just as easily as I could, determine that the summer range will retain 43%, at least, around 43% hiding cover, and the standard's only 35%. So we believe that the Forest Service's analysis was correct, and that... You get to the 43% by taking an area that's smaller than the drainage, and smaller than the total herd area, right? Well, that's correct. But what the standard says is on summer range. And so the relevant area to look at in applying that standard is the summer range. So it's a... Kind of like where the elk go in the summer, you're saying. That's correct. And this particular project area is core winter range. But it's also... And that's reflected in our thermal cover analysis in the EIS. But it's also classified as this general summer range. And so the two issues throughout the comment periods were focused on the thermal and the hiding cover to open road density, which is the focus for the hunting that Mr. Woodbury was talking about. That's, you know, it depends on... Their security depends on how much hiding cover you have in relation to how much open roads there are in the area. And so the summer range standard wasn't ever explicitly addressed. But our position is that the court can determine that compliance with that standard, which is all that matters. This is not a NEPA issue. This is a NIFMA issue. And the court can determine compliance with that standard from the administrative record. So that was first raised... Was that not raised in... It was raised in the comments in the administrative. I think that there are... I think that the comments... They're unclear. They say hiding cover. I'm not certain whether they tie that to the summer range standard or not. But they do talk about hiding cover. The way the Forest Service understood that, I think, was that it was talking about the hiding cover to open road density ratio, which is the concern for the hunting, the main concern for hunting. So your argument is if that can be sustained within the record, then it wouldn't be arbitrary and capricious. That's correct. All right. Again, this is a NIFMA issue. And so if it's reasonably determinable from the record that we've complied with the standard... But how do we know what the Forest Service was thinking when they did what they did? Even if the record would permit us to come to that conclusion, how do we know that that's the conclusion that the Forest Service reached? Because there is only a particular hiding cover announced. So the hiding... All the information that the Forest Service would need to make that determination is in the record. It's the hiding cover announced. It's after that. It's just a simple matter of mathematics. That the Forest Service didn't include the mathematics in the EIS shouldn't be determinative because the court can add and subtract as well as the Forest Service. All of the relevant information from which you can make... To make that determination is in the record. Right. We can do the math. But the question is whether... Can we be certain that the Forest Service viewed this denominator as just this more limited area that you are going to be using in the summer? That's right. That's right because what the standard says is summer range. And so there's no other applicable denominator that could apply. It has to be the summer range, the percentage of hiding cover on the summer range. And so it's irrelevant what the Forest Service thought. What's relevant is whether or not they actually complied with the standard in the forest plan. And from the record, the court can very easily determine that they did. Okay, thank you. Could you now talk about the claim that you don't have forest-wide monitoring here and that that is in effect required? This is particularly concerning as to the Gus Hawk because you say there's going to be some adverse effect. But if we can't look at the whole scope, how can any of us judge whether that's really an issue or not? I think that first I'd like to address the adverse effect point. It gets a little muddled in the EIS, I think, because what the EIS says is it will not affect viability but has the potential to affect individuals. And that's in a section that addresses both Alternatives 2 and Alternatives 3 collectively. And if you look in the biological evaluation, which is in our supplemental excerpts at page 11, it splits those out and then addresses the winter logging option first and then the summer logging option. And in the winter logging option... Which is option Alternative 2. That's correct, which was the selected alternative. There's no indication that Gus Hawks will be affected because they're migratory birds and so they'll be out of the project area. And then directly after that, in the summer evaluation, what it says is that individuals may be affected in the summer. And so the forest supervisor, in his record of decision, chose the winter option, which we do not think will have an effect on Gus Hawks because they will not be there. And because the biological evaluation then goes on further to state that there are three to four home ranges in the implementation area now, that there will be three to four home ranges in the implementation area after the project, that the theoretical home range that would encompass the project area, even after the 650-so acres of nesting habitat are reduced to foraging habitat, will still have well over 5,000 acres of habitat and will include all three necessary things, nesting habitat, the post-fledging family area, and the foraging habitat. And so... There's no finding that there will be no effect from the winter logging, is that right? I do not believe that it says... It doesn't explicitly say there will be no effect. What it says is that the area, even after the project, will retain enough habitat to meet the requirements of rentals for a home range, which we believe means that there will be no effect. But there's no statement that this will have no effect on Gus Hawks in that evaluation. We'd all be more comfortable if there had been appropriate monitoring so we could look at the whole picture. I understand, Your Honor. I was under the impression that the Ninth Circuit, in a case called Cutting Mountain, and the slide I've got is at 303 F. 3rd at pages 106, 8 to 70, had suggested that a forest-wide failure to monitor could be addressed and could be determined even if a site-specific project would not violate forest plan standards in the area of the project. I don't know if that makes sense, but my understanding is that's what we've held. But that would seem to mean that even if this project wouldn't hurt the Gus Hawk in its particular wildlife area, that still the project could be a vehicle to or a challenge to the project could be a vehicle to challenge and evaluate whether there's a forest-wide monitoring. Does that make any sense? I mean, is there a precedent that so sits? While you're answering that, let me just throw in another case, because in Idaho's Porting v. Thomas, I thought the court said you could use this proxy-unproxy analysis. If your habitat is okay, you can kind of extrapolate that without, you know, cross-region monitoring. So maybe you can address these cases in the context of whether a forest-wide monitoring is required. Well, I think with respect to the Cutting Mountain case, it's a pretty fine distinction, but there is a distinction between saying that this project will not affect viability itself, which Cutting Mountain says, okay, well, the project doesn't affect viability, even though it may have adverse impacts on the species, and therefore the forest-wide is reviewable, and a project like this one where we would say there's actually no adverse impact, which if you're not actually affecting, for instance, the Martin here, we're not actually affecting the Martin any because there are none there now, and there will be none there after the project. We do not think that would open up to a forest-wide challenge. Your distinction with Cutting Mountain is that there you think there was a project area impact, even if there wasn't a viability effect, and so therefore the forest-wide viability could be assessed, but here there's no impact, so it can't be? That's correct. I guess the problem here is that findings are so kind of wishy-washy, we're not sure whether there's some effect or not. I understand, and that's the record that we have. I understand. Yes, in my days as a lawyer, I always wanted to somehow have a better record than I had. I understand. I would add one more point with respect to the Martin. It's true that if we left the project alone, there would be some 680 acres that might be created, but in our cumulative impacts analysis, we noted that because of the Warm Springs fire area and its continued growth that in roughly the same amount of time, that area is going to add approximately 27,000 acres of Martin habitat, and so the potential loss of the 600 acres is not significant. If the Court has no further questions. No, I think we do not. Thank you. Thank you very much. For argument, all counsel and the Native Ecosystems Council versus the Forest Service is submitted and we're adjourned for this morning. All rise.
judges: B. Fletcher, McKeown, Gould